IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | HON. JEROME B. SIMANDLE |
| v. | Criminal No. 03-155 (JBS) |
| JAMES M. DWYER, | |
| Defendant. | **OPINION** |

APPEARANCES:

F. Emmett Fitzpatrick, III, Esq.
926 Public Ledger Building
620 Chestnut Street
Philadelphia, Pennsylvania 19106
     Attorney for Defendant

Thomas DiLeonardo, A.U.S.A.
Joseph Gribko, A.U.S.A.
UNITED STATES ATTORNEY'S OFFICE
401 Market Street
Camden New Jersey 08101
     Attorneys for the United States

**SIMANDLE**, U.S. District Judge:

Following a seven week trial, on November 29, 2004, a jury
convicted Defendant James M. Dwyer on all counts charged by the
Government in the Second Superseding Indictment ("Indictment"):
six counts of bank fraud, two counts of wire fraud, one count of
material false statements to a financial institution, and one
count of bankruptcy fraud.  Following return of the guilty
verdict, the sentencing phase of trial commenced on December 1,
2004, at which time the same Jury was asked to consider several
sentencing factors under the Federal Sentencing Guidelines.  On
December 2, 2004, the Jury found several of those factors to be

applicable.[1]

Defendant has moved for a judgment of acquittal under Rule 29, Fed.R.Crim.P.,[2] or, alternatively, for a new trial under Rule 33, Fed.R.Crim.P.[3]  Defendant submits that the following errors warrant such relief: (1) the admission of evidence of loans obtained by Dwyer from Jersey Shore Savings Bank in 1990 and 1991; (2) the Court's failure to dismiss the bank fraud charge contained in Count 2 of the Second Superseding Indictment; (3)

---

[1] Specifically, as to each of Counts 1, 2, 4, 5 and 7, the Jury found, beyond a reasonable doubt, that Mr. Dwyer derived more than $1,000,000 in gross receipts from the bank fraud offenses and that those offenses involved "more than minimal planning."  The Jury additionally found that the bank fraud offenses charged in Counts 1 and 2 were "committed through sophisticated means."  With respect to the false statement to a financial institution charged in Count 3, the Jury found that Mr. Dwyer derived gross receipts in excess of $1,000,000.  The Jury also found that Mr. Dwyer derived more than $1,000,000 in gross receipts from the wire fraud offenses charged in Counts 8 and 9 and that those offenses involved more than minimal planning.  The Jury did not find beyond a reasonable doubt that the wire fraud offenses were committed through sophisticated means. Additionally, as to Counts 2, 3, 5, 8 and 9 the Jury calculated the respective losses.  Finally, the Jury found that Mr. Dwyer "willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice," by knowingly testifying falsely at trial.

[2] Under Rule 29, "a defendant may move for judgment of acquittal, or renew such a motion, within 7 days after a guilty verdict or after the court discharges the jury, whichever is later, or within any other time the court sets during the 7-day period."  Fed.R.Crim.P. 29(c)(1).  Defendant's motion here is timely.

[3] Rule 33(a), Fed.R.Crim.P. states that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."

the Court's failure to dismiss Count 3 of the Second Superseding Indictment charging Defendant with making a material false statement to a financial institution; (4) admission of statements of certain out-of-court declarants; (5) the Court's permitting summary testimony of FBI Agent Pennock; (6) the Court's denying Defendant's motion to strike Count 10 charging Dwyer with bankruptcy fraud, Dwyer's motion to strike the testimony of Michael Hoffman, and Defendant's request to preclude Assistant United States Attorney from representing the Government; (7) the Court's denying Defendant's motion to strike the Second Superseding Indictment; (8) the Jury instruction at the guilt phase of trial stating that all of the means and methods used by the United States to collect the evidence presented were lawful; (9) the Court's instruction to the Jury at the sentencing phase of trial that it not treat Mr. Dwyer's companies as legally distinct entities; (10) the Court's failure to strike Counts 1 and 7 of the Second Superseding Indictment charging Dwyer with bank fraud; and (11) insufficiency of evidence supporting judgment of conviction.

**I.    DISCUSSION**

    A.    <u>404(b) Evidence of 1990 and 1991 Jersey Shore Savings Bank Loans</u>

Defendant first argues that the Court erred in admitting evidence under Rule 404(b), Fed.R.Evid., pertaining to loans obtained by Dwyer from Jersey Shore Savings Bank ("Jersey Shore") (now Washington Mutual Bank) in 1990 and 1991.  (Def. Br. at 1.) The Court's reasoning underlying its decision to admit such evidence was articulated in a Memorandum Opinion filed by the Court on October 18, 2004 and it is not necessary to repeat the specifics again here.  Briefly, though, as stated in its Opinion, contrary to Defendant's suggestion now, the evidence pertaining to those loans was admitted not for its proof of Dwyer's propensity for bank fraud but, rather, for its probative value in showing that "he had previously submitted bogus financial information to a bank to obtain loans under the cover of a forged independent accountant's letterhead and signature."  (Slip Op. at 10.)  Moreover, the Court correctly predicted in its decision that Defendant at trial would likely seek to distance himself from the knowledge of the false financial submissions made in connection with the charged loans, such as by laying blame on Michael McKeever; and, that Mr. Dwyer personally committed these similar acts in 1990 and 1991 prior to his hiring Mr. McKeever pointed in favor of admitting the disputed evidence.  (<u>Id.</u>)

4

B.   <u>Count 2 of the Second Superseding Indictment</u>

Count 2 of the Second Superseding Indictment charges Dwyer with fraudulently obtaining a loan from National Penn Bank ("NatPenn") in violation of 18 U.S.C. §§ 1344 and 2.  Defendant now claims that for the following reasons the Government failed to prove that claim as a matter of law:  first, the construction loan obtained from NatPenn actually consisted of two loans; second, the pre-sale requirement (whereby NatPenn required a certain number of pre-sale agreements prior to approving the construction loan to Dwyer) applied only to the "revolver" component of the that loan; and finally, NatPenn never made any loan advance under the revolver component.  (Def. Br. at 4.)

First, Defendant maintains that the NatPenn construction loan consisted of two loans and, that NatPenn never made any loan advance under the revolver component.  Thus, Defendant now argues, the pre-sale agreements were not relevant and any evidence relating thereto should not have been admitted.  (Def. Br. at 4.)  The Government argues in opposition that the evidence of the forged pre-sale agreements was material, as illustrated by the testimony of NatPenn's senior Vice President, Dennis Moyer. Specifically, Moyer testified that the bank would not have made the construction loan to Dwyer if the pre-sale agreements contained forged signatures, the checks supplied by the purported purchasers had not been deposited, or the purported pre-sales

5

contained numerous contingencies other than mortgage contingencies.  (Govt. Br. at 5-6.)

Second, Dwyer argues that the pre-sale requirement applied only to the revolver portion of the loan.  The Government disputes this argument, citing the commitment letter signed by Dwyer in which NatPenn required that Defendant have the pre-sales prior to closing the loan, as well as the testimony of Dennis Moyer that NatPenn would not have closed the loan but for the pre-sales.  For that reason, the Government argues, even if the Court were to accept Defendant's allegation that the pre-sales had related strictly to the revolver portion of the loan, NatPenn still would not have loaned any money to Dwyer.  (Govt. Br. at 6.)

Finally, Defendant argues that the final sentence of paragraph 8 in Count 2 should have been stricken.[4]  First,

---

[4] That sentence states:

Additionally, the purported presales defendant JAMES M. DWYER presented to NatPenn prior to the Construction Loan closing were not "bona fide sales" because:  (1) a minimum deposit of 10% of the gross sales price per contract with each purchaser was never actually received as most of the purported purchasers did not authorize defendant JAMES M. DWYER to cash or otherwise negotiate their deposit checks; (2) a rescission period on the purported presales did not exist as the purported purchasers' deposit money was fully refundable at any time; and (3) the purported purchasers deposit checks were not held on deposit in an escrow account with NatPenn or a title company approved by NatPenn.

Defendant argues that, contrary to paragraph 8(1), each of the pre-sale buyers "wrote and signed" checks in the amount of 10% of the gross sales price.  Even if true, however, Defendant's argument is flawed – that paragraph states that a minimum deposit "was never actually <u>received</u>."  (emphasis added).

Second, Dwyer maintains that paragraph 8(2) "makes no sense at all" and, thus, "no reasonable Jury could possibly understand what was being charged by that statement."  (Def. Br. at 5.)  As noted above, that portion of Count 2 provides that the purported pre-sales were not "bona fide sales" because "a rescission period on the purported presales did not exist as the purported purchasers' deposit money was fully refundable at any time." This is not hard to understand.  The sales were not bona fide because they had no reality – the "buyer" could rescind at any time and the checks would be returned.

Finally, defendant argues that paragraph 8(3) should have been stricken as the evidence showed that "NatPenn did not require the checks to be deposited into a NatPenn escrow; that its officials knew and approved of the title company that held the deposit checks; and that its senior loan officer, Joe Walker, authorized the title company to hold those checks uncashed rather than to deposit them."  (Def. Br. at 5.)  The Government responds that "Dwyer's self-serving statement that Joe Walker . . . authorized him to hold the checks rather than cash them, is

irrelevant in the context of a Rule 29 motion where all factual disputes are resolved in favor of the Government." (Govt. Br. at 5 n.1.) And, Moyer's testimony revealed that the bank required the check to be held on deposit. That testimony, according to the Government, is consistent with the terms of the purchase agreements. Furthermore, the documentation requested by the bank to verify that the deposit checks were deposited into an interest bearing bank account were falsified. (<u>See</u> Govt. Ex. 99.) The Court agrees.

In any event, the Government contends, as to all of Defendant's arguments relating to Count 2, the false financial information provided to NatPenn in connection with the construction loans is, in and of itself, sufficient to sustain the conviction. (Govt. Br. at 6.) The Court again agrees and denies Defendant's motion as to Count 2.

C.    <u>Count 3 of the Second Superseding Indictment</u>

Defendant Dwyer additionally moves for judgment of acquittal on Count 3, charging Defendant with "knowingly and willfully mak[ing] a material false statement in applications for advances" on the NatPenn Construction loan, for the purpose of influencing NatPenn to advance Construction Loan draws, in violation of 18 U.S.C. §§ 1014 and 2.  Specifically, the charge states in Count 3, ¶ 5 that Dwyer

> signed Draw Requisitions which stated that all of the Construction Loan advances had been used for the authorized purpose of paying for work on the Linwood Business Campus construction project, when, in fact, all advances had not been used for that construction project.

The text of Count 3, ¶ 2 also alleged that "the Draw Requisition contained a signed statement by defendant James M. Dwyer that all Construction Loan advances had been used to pay for work on the Linwood Business Campus project."  The actual language of the Draw Requisitions pertaining to Count 3, which Mr. Dwyer signed for each of the loan draws, contains a printed statement as follows:

> The undersigned contractor certifies that, to the best of the contractor's knowledge, information and belief, the work covered by this application for payment has been completed in accordance with the Contract Documents, that all amounts had been paid by the Contractor for Work for which previous Certificates of Payment were issued and payments received from the Owner, and that current payment shown here is now due.

    1.   <u>Defendant's Argument in Support of Judgment of Acquittal as to Count 3</u>

Defendant Dwyer asserts that "there is an obvious variance" between the language contained in the Second Superseding Indictment and that contained in the above statement signed by Dwyer. (Def. Br. at 6.)  The defense argues that there is no evidence that Dwyer made any such statement (that "all of the Construction Loan advances had been used for the authorized purpose of paying for work on the Linwood Business Campus construction project") because the Draw Requisition contained no such statement.  Moreover, Defendant points out that the statement "cannot properly be interpreted without reference to all of the 'Contract Documents.'" (<u>Id.</u> at 8.)  And, according to Dwyer, the Government failed to introduce Exhibits D22 and D36, allegedly "the most important" such documents.  (<u>Id.</u>)

In any event, Defendant argues, Mr. Dwyer signed the form containing that statement in his capacity as president of the corporation that was the Contractor for the job.  And, because the statement is a certification to the Owner from the Contractor, he argues they could not have been made by Mr. Dwyer in his individual capacity, since his company was also the owner of the project.  (<u>Id.</u> at 7.)  Indeed, Dwyer now argues, the Contractor and Owner as identified in the above statement are "legal entities separate and distinct from Mr. Dwyer." (<u>Id.</u> at 8.)  This aspect of Defendant's argument lacks merit, since there

was ample evidence from which the Jury could conclude that Mr.
Dwyer acted for his own benefit as sole proprietor or owner of
these entities, and alternatively because he was also charged
with aiding and abetting the violation of § 1014 in count 3.

Defendant argues that his Due Process rights were violated
by the variance between the Indictment's charge and the proof at
trial.  Further, Defendant argues that the rule of lenity
requires that critical ambiguities be resolved in favor of
Defendant, and that judgment of acquittal should be entered as to
Count 3.

> 2.  <u>Government's Opposition to Dwyer's Motion for
>     Judgment of Acquittal on Count 3</u>

In opposition, the Government argues that (1) there is no
variance between the substance of the language in Count 3 and the
facts adduced at trial and, in any event, Defendant has suffered
no prejudice; and (2) the rule of lenity does not apply here.

First, the Government argues that the substance of the two
statements at issue is identical in that they both stand for the
proposition that "the loan amounts had been used '<u>for work</u>' on
the Linwood project."  (Govt. 12/7/04 Ltr. at 2.)  According to
the Government, by signing the Draw Requisitions, Dwyer
acknowledged that all draw money currently applied for would be
used to pay the billings for work completed by the Linwood
project subcontractors.  (<u>Id.</u>)  Moreover, although "[t]he
indictment does not specifically state that Dwyer made the false

11

statement at issue directly to NatPenn," it does "state[] that Dwyer made the false statements and that they influenced the bank." (Govt. Br. at 7.) And, that statement was included with each draw application package submitted to NatPenn.

In any event, the Government argues, Dwyer was not prejudiced by any variance between the statements as he was not surprised by "the facts adduced at trial regarding the operative language contained in the Draw Requisitions" and, thus, was able to properly defend against the charges in Count 3. Moreover, as the allegations contained in Count 3 set forth the crime and documents Dwyer utilized in connection therewith, there is no double jeopardy concern. (Govt. Br. at 8.)

Finally, according to the Government, the rule of lenity is a rule of statutory construction that is only applicable when a criminal statute or sentencing guideline is ambiguous. See United States v. R.L.C., 503 U.S. 291, 305 (1992); United States v. Batchelder, 442 U.S. 114, 121-22 (1979); United States v. Bass, 404 U.S. 336, 347-48 (1971). Thus, the rule is "simply irrelevant" here. (Govt. Br. at 9.) The Court agrees that the rule of lenity does not apply in interpreting language of an indictment.

    3.   A Judgment of Acquittal on Count 3 Will Be Entered

    The Indictment charges that the "materially false statement" in Dwyer's applications for loan advances was "that all of the

Construction Loan advances had been used for the authorized purpose of paying for work on the Linwood Business Campus construction project," when the fact was that "all advances had not been used for that construction project."  (Count 3, ¶ 5.) The essence of Count 3, contained in ¶ 2 and repeated in ¶ 5, was that Dwyer falsely stated that all Construction Loan advances had been used to pay for work on the project.  The Government introduced ample proof at trial that the advances had been at least partially diverted from paying for the completed works. But the Government did not introduce any evidence of the actual content of Dwyer's allegedly false statement other than the Draw Requisitions themselves.

The actual language of the Draw Requisition is "that all amounts have been paid by the Contractor for work for which previous Certificates for Payment were issued . . . ."  The latter half of that sentence modifies "work," not "paid," and, thus, it does not specify what money must have been used to make the payment.  In other words, it does not specify that the bank's loan proceeds were required to be used to pay for the work. Rather, it specifies only what work must have been paid for.  It could be possible that a contractor could truthfully certify that the work had been paid for even if the construction loan proceeds were not the source of the funds used.

Finally, the Draw Requisition is properly read as certifying

13

"that all amounts have been paid by the Contractor **for Work for which . . . payments [were] received from the Owner**."  That statement merely provides that the payment made <u>by the owner to the contractor</u> would be applied towards the work for which that payment was made.  It does <u>not</u> provide that <u>the loan made to the owner</u> would be used for any particular purpose.  Thus, by signing the Draw Requisition, Dwyer certified nothing more than that particular work had been completed and paid for, not that he had used a particular bank loan advance payment to complete that work.  Thus, there is indeed a variance between the false statement charged (<u>i.e.</u>, that all Construction Loan advances had been used to pay for work on the project) and the false statement proved (<u>i.e.</u>, "that all amounts have been paid by the Contractor for work for which previous Certificates of Payment were issued").  The latter statement was proved false by testimony from subcontractor after subcontractor demonstrating substantial non-payment for their completed work for which Dwyer had received the Bank's advances.  There was likewise ample proof that NatPenn was influenced by this false statement in advancing the Construction Loan draws, as the Bank's officer so testified.  The issue presented is whether this variance is fatal to the charge in Count 3.

A variance occurs when "the charging terms are unchanged, but the evidence at trial proves facts materially different from

those alleged in the indictment." <u>United States v. Castro</u>, 776
F.2d 1118, 1121 (3d Cir. 1985), <u>cert</u>. <u>denied</u>, 475 U.S. 1029
(1986), quoted in <u>United States v. Balter</u>, 91 F.3d 427, 441 (3d
Cir.), <u>cert</u>. <u>denied</u>, 519 U.S. 1011 (1996).  A variance between
the indictment and the evidence at trial becomes impermissible if
it broadens the basis for conviction beyond the elements of the
crime alleged; it is permissible, however, if it narrows the
scope of the evidence to prove an offense included in the
indictment, and if the narrowing of the charge does not prejudice
the defendant.  <u>Castro</u>, 776 F.2d at 1122-23.

This distinction was recently explained by Judge Alito in
<u>United States v. Lee</u>, 359 F.3d 194, 208 (3d Cir. 2004) as
follows:

> "In order to rise to the level of an impermissible
> amendment, a variance must act to modify the
> indictment so that the defendant is convicted of a
> crime that involves elements distinct from those
> of the crimes with which he was originally
> charged." [<u>United States v. Asher</u>, 854 F.2d 1483,
> 1497 (3d Cir. 1988)]. "Thus, where trial evidence
> [has] amended the indictment by <u>broadening</u> the
> possible bases for conviction from that which
> appeared in the indictment, the variance violates
> the defendant's substantial right to be tried only
> on charges returned by a grand jury." <u>Id.</u>
> (citations and quotation marks omitted, emphasis
> and alterations in original).  "If, on the other
> hand, the variance does not alter the elements of
> the offense charged, [courts] focus upon whether
> or not there has been prejudice to the defendant."
> <u>Id.</u> (alteration in original).

<u>United States v. Lee</u>, 359 F.3d at 208.

For example, in <u>Castro</u> several defendants were charged with,

among other things, conspiracy to possess with the intent to distribute marijuana, and with attempt to possess with the intent to distribute marijuana, in violation of 21 U.S.C. § 846. 776 F.2d at 1120. The indictment alleged 24 overt acts in furtherance of the conspiracy, of which 10 acts allegedly occurred in Texas and Florida, culminating in a transaction in Bristol, Pennsylvania. Id. at 1121. The evidence at trial, however, conformed only to a narrower theory of conspiracy to purchase the Bristol marijuana. The Court of Appeals upheld the convictions for conspiracy and attempt because proof of the offenses in Texas and Florida were unnecessary to prove the Bristol transaction conspiracy. The smaller version of the conspiracy, embracing Bristol, was set forth in the indictment with sufficient particularity that the "indictment clearly [gave] notice to competent defense counsel that they would have to defend against the charge that defendants conspired to purchase the Bristol marijuana." Id. at 1123. The convictions based upon a narrowed charge requiring proof of the same elements of conspiracy, wherein the narrowed proofs did not prejudice the defendants compared with the stated charge in the indictment, were affirmed.

Similarly, in United States v. Miller, 471 U.S. 130 (1985), the Supreme Court addressed the variance between an indictment and the trial evidence. The grand jury charged Miller with mail

16

fraud by defrauding his insurer by consenting to the burglary of
his own company and claiming losses from the burglary in excess
of the stolen property, in violation of 18 U.S.C. § 1341.  The
evidence at trial proved only the latter allegation of claiming
inflated losses.  The Court upheld the conviction, even absent
proof that Miller had consented to the burglary, because the
indictment properly alleged violations of 18 U.S.C. § 1341 and
placed Miller on notice of the theories by which the acts
constituted violations.  Whether Miller committed mail fraud
through fraudulently inflating the value of his loss was held to
be independent of the indictment's other theory of mail fraud,
namely, that he also participated in the burglary.  Id. at 140.
Basically, the indictment "charged more than was necessary."  Id.
The Court concluded that "what was removed from the case was in
no way essential to the offense on which the jury convicted."
Id. at 145.

     The issue, then, is whether this case fits the paradigm of
Miller, Castro, Asher and Lee, in which the evidence presented
narrowed the charge, required proof of the same essential
elements of the charge, and caused no prejudice to the defendant
by virtue of the narrowing of the theory.  Here, the
circumstances present a close question.  The Indictment specifies
the document in which the false statement was contained (the Draw
Requisition), and the purpose for which that document was signed

17

(to influence NatPenn to issue the draws), which were proved by evidence at trial. But the specified false statement itself was not proved, because the Draw Requisition contained no certification that "all of the Construction Loan advances had been used for the authorized purpose of paying for work . . . ." The Government has pointed to no other evidence of such a declaration by Dwyer beyond the Draw Requisitions.

The proofs at trial reflected a broadening of the Count 3 accusation to include other false statements not charged in the Indictment, such as that the Contractor (Dwyer) has paid for all the work. That Dwyer falsely certified that he had paid for the prior work is materially broader than the charged conduct, which only involved a specific statement that all loan advances had been used for that purpose. The danger from this variance is that Defendant may have demonstrated at trial that there was no evidence that the latter specific statement had ever been made, and therefore be entitled to acquittal, while the Jury convicted him upon strong evidence of the falseness of the <u>uncharged</u> broader statement that the Contractor had paid for the prior work. It is the specificity of the charge in Count 3 that leads to this conclusion. The grand jury did not allege, with generality, that the Draw Requisition was false, in which event proving any material false assertion therein would trigger criminal liability under § 1014. It alleged instead that a

specific aspect of that Draw Requisition was a false statement, and that is all that Dwyer was required to defend.

Accordingly, the Court finds that Defendant Dwyer is entitled to a judgment of acquittal on Count 3 as charged, and the conviction therein will be vacated.  A judgment of acquittal, rather than a new trial under Rule 33, is the proper remedy for prejudicial variance.  <u>United States v. Camiel</u>, 689 F.2d 31 (3d Cir. 1982).

D.   <u>Hearsay Objections</u>

Citing <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), Defendant objects to the admission at trial of certain testimony.[5] <u>Crawford</u> held that "[w]here testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination." <u>Id.</u> at 68.  Though the Court there did not define "testimonial," it did note that the term "applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations."[6]  <u>Id.</u>  That term would additionally include,

> <u>ex parte</u> in-court testimony or its functional equivalent – that is, material such as affidavits, custodial examination, prior testimony that the defendant was unable to cross-examine, or similar pretrial statement that declarants would reasonably expect to be used prosecutorially; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions; statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be made available for use at a later trial.

---

[5] Defendant limits his arguments in the instant motion to the admissibility of various testimony under <u>Crawford</u>.  (Def. Supp. Br. at 1.)  To the extent that certain of Defendant's objections at trial were based on other authority, the Court will not reexamine its rulings herein.

[6] In <u>Crawford</u> the Court found that the admission of a tape-recorded statement by the petitioner's wife to the police was testimonial and, thus, having been denied the opportunity to cross-examine the declarant, the petitioner had been denied his Sixth Amendment rights.  541 U.S. at 68.

Id. at 51-52 (internal citations omitted) (alterations in
original).  However, the Sixth Amendment's "core concerns" are
not implicated by, for example, "[a]n off-hand, overheard
remark,"[7] or "a casual remark to an acquaintance . . . ."  Id. at
51.  In other words, Crawford recognized that "testimony" is
typically "[a] solemn declaration made for the purpose of
establishing or proving some fact."  Id. (quoting 1 N. Webster,
An American Dictionary of the English Language (1828)).

The Third Circuit interpreted the meaning of "testimonial
evidence" as used in Crawford in United States v. Hendricks, 395
F.3d 173 (3d Cir. 2005).  There, the issue was whether legally
obtained wiretap evidence and evidence of conversations between
some of the defendants and a murdered confidential informant were
admissible at trial under Crawford.  In holding that those
statements did not violate the "virtual per se rule of exclusion"
adopted by the Court in Crawford, the court in Hendricks, 395
F.3d at 179, 181 (citing Crawford, 541 U.S. at 51), recognized
that "the recorded conversations do not qualify as 'testimonial'
under any of the three definitions mentioned by the Court" in
Crawford.  Hendricks, 395 F.3d at 181; see Crawford, 541 U.S. at
51-52.  Ultimately, the court held that the recordings were
"much more similar" to a "casual remark [made] to an

---

[7] Though the Court noted that the unreliability of such a
statement would make it "a good candidate for exclusion under
hearsay rules . . . ."  Crawford, 541 U.S. at 51.

acquaintance" than to a "formal statement to government officers," the latter "bear[ing] testimony in a sense that [the former] . . . does not." <u>Crawford</u>, 541 U.S. at 51.

### 1.   Matthew Moore

Defendant first reiterates the objection by defense counsel at trial to the admission of testimony by Matthew Moore relating to conversations with the Amresco asset manager.  The Court overruled the objection at trial, explicitly pointing out to the Jury that the contents of the conversations were not offered into evidence for the truth of the matter asserted.  Rather, the testimony was admitted for its nonhearsay purpose of demonstrating the effect of the conversation on Moore in taking certain action relating to the Amresco loan.  That non-hearsay testimony was, for those reasons, properly admitted.

Second, defense counsel objected at trial to the admission of testimony relating to the fact of conversations between Mr. Dwyer and Tom Buuck, a loan officer at Amresco.  The Court sustained the objection to the extent that the Government sought to introduce the contents of the conversation.

### 2.   Sean Waelde

Defendant Dwyer also objects to the admission of certain testimony of Sean Waelde, a research analyst for Washington Mutual, offered as part of the Government's case-in-chief. Waelde testified at trial in the capacity of custodian of

business records.  Specifically, Waelde testified to the contents
of loan file documents relating to Dwyer's Washington Mutual
loan.  As business records themselves are "statements that by
their nature [are] not testimonial," Crawford, 541 U.S. at 56, it
follows that testimony which is admissible under Fed.R.Evid.
803(6) and which relates solely to the contents of those same
records certainly does not offend the Sixth Amendment.

    3.  Deborah Constant

Dwyer next argues that the Court improperly permitted
testimony by Deborah Constant relating to "critical statements
and instructions that Mr. Mott allegedly made to her."[8]  (Def.
Supp. Br. at 15.)  Following the objection by defense counsel at
trial, the Court carefully instructed the Jury as follows:

COURT:    I will permit the witness to testify to the manner in
        which she handled the deposit checks, some of the
        testimony stands, and the fact that Joel Mott
        instructed her to do it that way is admissible.

In the first instance, the fact of a conversation is not hearsay.
Mott's "instruction" is Ms. Constant's description of the
business practice she followed.  Similarly, Constant's testimony
as to how she handled the depositary checks is based on her own
actions.  For these reasons, the Court's ruling was proper.

---

    [8] The Court instructed the Jury to disregard testimony by
Ms. Mott regarding conversations she overheard between Dwyer and
Joel Mott.

### 3.   Agent Pennock

Defendant also disputes the admission of summary testimony
by Agent Pennock relating to Government's Trial Exhibit 157, a
summary schedule of draw totals and unapplied loan proceeds from
the Linwood construction loan.  Because the substance of
testimony at issue was contained on that chart, and because there
had been prior evidence reflecting its contents, the Court
overruled the defense counsel's objection at trial.  That ruling
will stand.

### 4.   William Saldutti

The next portion of testimony to which Defendant objects
under Crawford is that of William Saldutti, a collection agent
for Third Federal Savings Bank, regarding conversations he had
with a waitress and a valet attendant at the Flanders Hotel
roughly in mid-July 2001, both of whom were Defendant's
employees.  Specifically, Saldutti testified that he asked both
individuals generally about how business was at the Flanders.
The substance of those conversations, however, more closely
resembles "casual remark[s] to an acquaintance" and not, as would
be prohibited under Crawford, 541 U.S. 36, "formal statement[s]
to government officers."  For that reason, the admission of their
statements does not violate the Sixth Amendment.  Id.; see
Hendricks, 305 U.S. at 181.  The statements were properly
admitted as admissions of Dwyer's employees concerning matters
within the scope of, and during, their employment under
Fed.R.Evid. 801(d)(2)(D).

24

     5.   <u>Dennis Curley</u>

Defendant objects under <u>Crawford</u> to testimony by Dennis Curley, the former general manager of the Dwyer Organization from December 1997 through January 2000.  Specifically, Defendant cites testimony relating to Government Exhibit 410, a profit and loss statement purportedly received by Mr. Curley from Mr. Dwyer. (10/13/04 Curley Tr. at 204:8-18.)  That exhibit was introduced into evidence by the Government without objection by Defendant. The Court permitted the witness to testify as to how the loan expenses reflected on the profit and loan statement would have affected the profit or loss of Dwyer's business because the Court was satisfied that Mr. Curley was "familiar with financial statements of this type."  (<u>Id.</u> at 99:4-5.)  Defense counsel did not raise a hearsay objection to this testimony however, instead arguing that the testimony constituted impermissible expert opinion.  Because the <u>Crawford</u> objection was not "brought to the court's attention" at trial, the Court will only consider this argument if the admission of Curley's testimony constituted "[a] plain error that affects substantial rights" of Defendant. Fed.R.Crim.P. 52(b); <u>see</u> <u>Wiborg v. United States</u>, 163 U.S. 632, 658 (1896).  The Court holds that testimony relating to how loan expenses affect the profit or loss of a business was, as the Government notes, collateral to the charged crimes and did not affect Mr. Dwyer's "substantial rights" at trial.  Accordingly, the Court will not examine Defendant's <u>Crawford</u> objection to this testimony.

6.  <u>Dennis Moyer</u>

Finally, Defendant Dwyer objects to the Court's admission of certain testimony by Dennis Moyer, Senior Vice President of National Penn Bank.  The objection by defense counsel at trial, however, was not made on the basis of hearsay.  Indeed, Mr. Fitzpatrick stated: "my objection, just to be clear, sir, is that he's just being asked to speculate."  (10/18/04 Tr. at 69:16-17.) Once again, Defendant is only permitted to raise an objection that was not previously "brought to the court's attention" at trial, where the admission of the testimony constituted "[a] plain error that affects substantial rights" of Defendant. Fed.R.Crim.P. 52(b); <u>see</u> <u>Wiborg v. United States</u>, 163 U.S. 632, 658 (1896).  That the Court allowed Mr. Moyer to testify as to whether there were additional expenses associated with the National Penn Bank loan default does not raise those concerns. The Court will not disturb its earlier ruling.

For the above reasons, the Court will deny Defendant's motion arguing that certain "testimonial" evidence was improperly admitted into evidence in violation of Mr. Dwyer's Sixth Amendment right to confrontation under <u>Crawford v. Washington</u>.[9]

_____

[9] The papers initially filed by Defendant in support of the instant motion referenced, in general terms, additional testimony that Defendant argued was improperly admitted – <u>i.e.</u>, Vito Pantileone's testimony about alleged statements by and to Clarence Martindell; Dennis Moyer's testimony about alleged statements by and to Clarence Martindell; Floyd Haggar's testimony about statements by and to John Hosey; and Robert

E.   <u>Summary Testimony of Agent Pennock</u>

"Charts that summarize documents or testimony, already admitted into evidence, may be admissible under Rule 611(a) . . . of the Federal Ruled of Evidence as demonstrative evidence, as opposed to Rule 1006, as substantive evidence."[10]   <u>United States v. Blackwell</u>, 954 F. Supp. 944, 973 (D.N.J. 1997).  Defendant objects to the admission of summary testimony given, and of the summary charts prepared, by FBI Agent Pennock, on the grounds that it generated confusion and, thus, prejudiced Dwyer.  (Def. Br. at 11.)  Specifically, Dwyer argues that the summary testimony included statements that Defendant had "co-mingled" and "diverted" loan proceeds from NatPenn's construction loan and that the summary charts indicated as such.  (<u>Id.</u> at 11.)

_____

Mazzei's testimony about statements by and to Jim Schermerhorn. At the time those papers were filed, Defendant was not in possession of the relevant trial transcripts.  By letter dated March 8, 2005, however, the Court permitted Defendant to submit supplemental briefing on the <u>Crawford</u> issue and instructed that such submission make "specific citations to testimony implicating his <u>Crawford v. Washington</u> argument."  (3/8/05 Ltr.)  Indeed, the request for supplemental briefing was granted on the condition that it be "keyed to the record."  (<u>Id.</u>)  Though Defendant admittedly is currently in possession of the transcripts covering the testimony of Pantileone, Moyer, Haggar and Mazzei, (Def. Supp. Br. at 1 n.1,) Defendant has failed to make any specific reference to the challenged testimony in his supplemental brief. The Court, thus, will not consider Defendant's objections to the testimony of these four individuals.

[10] Under Rule 1006, Fed.R.Evid., "[t]he contents of voluminous writings, recordings, or photographs which cannot conveniently be examined in court may be presented in the form of a chart, summary, or calculation."

Moreover, according to Dwyer, the charts were not explanatory and were incomplete insofar as they excluded certain pertinent information.  (<u>Id.</u> at 12.)

The Government denies that Agent Pennock was selective in the testimony he summarized.  (Govt. Br. at 13.)  Morever, given the volume of information summarized, summary charts and testimony by Agent Pennock were appropriate.  (<u>Id.</u>)  Indeed, Dwyer's bank records alone amounted to several hundred pages.  (<u>Id.</u> at 12.)  Finally, as to Pennock's testimony that Dwyer had "co-mingled" funds, "it was never the Government's contention that the commingling was improper.  In fact, the Government had no objection to the defense's request that the Court clarify this point to the Jury."  (<u>Id.</u> at 13 n.2.)

F.    Count 10 of the Second Superseding Indictment;
      Testimony of Michael Hoffman; Assistant U.S. Attorneys
      DiLeonardo and Gribko

By Order dated November 9, 2004, the Court ordered that

judgment of acquittal be entered as to paragraphs 6(e) and 7(d)

of Count 10 of the Second Superseding Indictment. [Docket Item

89.]  Dwyer now claims that the Court erred by not ordering

judgment of acquittal on the remainder of Count 10 as the

Government fabricated a key document and knowingly had its

witness, Michael Hoffman, falsely testify as to that document.

(Def. Br. at 13.)  Additionally, Defendant argues, the conduct of

the Assistant United States Attorneys violated the Rules of

Professional Conduct, thereby requiring the Court at that time to

preclude AUSA's DiLeonardo and Gribko from further representing

the Government at trial.  All of this was carefully considered

during trial and Defendant presents nothing new here.

     The Government denies that there was any attempt to admit

false evidence.  Moreover, it maintains that all of the

Government's exhibits admitted at trial are originals or true and

accurate duplicates.  (Govt. Br. at 14.)

     The Court conducted hearings and treated with this matter at

some length on November 2, 3 and 8, 2004.  The Court concluded,

after a Rule 104 hearing on November 2, that the inventory

document to which Defendant objected – Ex. 330A – was

inadmissible, and the Jury never saw or heard of the document's

29

contents.  The Court denied Defendant's motion to dismiss Count
10 for alleged prosecutorial misconduct, finding that the
prosecution team had not fabricated evidence and that the
prosecutors perceived that defense counsel had no objection to
the use of the abridged Ex. 330A, which had, in fact, been
disclosed to Mr. Fitzpatrick beforehand but not sufficiently
explained and discussed.  On November 8, the Court denied
Defendant's application to disqualify the prosecutors for alleged
violations of the Rules of Professional Conduct, finding that no
such misconduct had occurred, for reasons stated in the Oral
Opinion of November 8, 2004.  Defendant raises no new arguments
and his motion will again be denied.

G.   <u>Motion to Strike Second Superseding Indictment</u>

Defendant next argues that the Court improperly denied
Dwyer's motion to strike the Second Superseding Indictment.
(Def. Br. at 14.)  Specifically, Defendant argues that the
Government's inclusion of "Supplemental Allegations" in the
Second Superseding Indictment constituted surplusage, thereby
violating Dwyer's Fifth and Sixth Amendment rights.  (<u>Id.</u> at 14-
18.)  As such, Dwyer now argues that "the Second Superseding
Indictment, or at least the 'Supplemental Allegations,' should
have been stricken."  As the Supplemental Allegations <u>were</u>
redacted from the indictment upon submission to the jury at the
guilt phase, Defendant's argument is fatally flawed.  The grand
jury made findings and included the Supplemental Allegations in
the Second Superseding Indictment at pp. 36-37 in early August,
2204, following the Supreme Court's decision in <u>Blakely v.
Washington</u>, 124 S.Ct. 2531 (2004).  In that decision, the Supreme
Court, in reviewing a guideline sentencing scheme of the State of
Washington, held that any fact (other than a prior conviction)
which triggered an enhancement of a sentence above the prescribed
base offense level must be the subject of notice to the defendant
and proof beyond a reasonable doubt to the jury at trial.  It was
not only a reasonable interpretation of <u>Blakely</u> for the
Government to have obtained these Supplemental Allegations, but
also a prescient one, since the Supreme Court determined several

31

months later, in <u>United States v. Booker</u>, 125 S.Ct. 738 (2005),
that the U.S. Sentencing Guidelines were unconstitutional in
permitting such enhancements without proof to a jury beyond a
reasonable doubt, but that the impairment is remedied if the
Guidelines are deemed non-mandatory guidance at sentencing.
Further, there was no conceivable prejudice to Defendant Dwyer
from this procedure.

This issue was fully briefed by both sides and, following
oral argument at a hearing on September 29, 2004, the Court
denied Defendant's motion. [Docket Item 64.]  Indeed, by that
same Order the Court ordered that "the [Second Superseding]
Indictment as read and submitted to the jury at the guilt phase
of trial shall be redacted <u>so as not to include the Supplemental
Allegations found at pages 36 and 37 of the Indictment</u>; relevant
Supplemental Allegations shall be reinserted and tried in the
sentencing phase, if any, of trial."  (emphasis added).  The Jury
was thus unaware of the Supplemental Allegations in the guilt
phase of trial, while Defendant Dwyer was given pretrial notice
of the sentencing factors on which the Government would seek
enhancements (with the single exception of the factor which arose
at trial through Mr. Dwyer's commission of perjury amounting to
obstruction of justice).

32

H.   <u>Jury Instruction re: Investigative Techniques</u>

Instruction Number 14 of the Jury Charge entitled

"Investigative Techniques," instructed the Jury that:

> The evidence presented to you was collected by the
> Government through various means and methods.  All of
> the means and methods used by the United States to
> collect the evidence presented to you were lawful.
> Because these methods are lawful, you should disregard
> any opinions of your own about whether these methods
> are proper.

[Docket Item 114.]  Defendant objects to that instruction,

asserting that it was error for the Court to make such "factual

findings" and to prohibit the Jury from making "contrary factual

findings."  (Def. Br. at 18.)  Specifically, Defendant maintains

that the record at trial contained facts from which a reasonable

juror could have concluded that the investigative techniques

utilized by the Government in connection with the case were not

lawful – visits by FBI agents to the workplace of Kerry Kelly

shortly before trial; suggestions by the FBI to Ms. Kelly that

"she could place the events in" the Fall of 2001 "by recalling an

event such as the attacks of 911"; and intentional introduction

of so-called false documents and perjured testimony and the

subsequent withdrawal thereof.  (<u>Id.</u>)

The Government maintains that it is proper for FBI agents to

meet with various witnesses before trial.  (Govt. Br. at 18.)

Indeed, the Government argues, it is the duty of Government

attorneys to conduct such interviews in preparation for cases.

33

(Id.)  This instruction served the limited purpose of informing the Jury that none of the trial evidence they heard had been determined to be unlawful, none had been suppressed, and the methods of collecting and preserving the evidence complied with the Federal Rules of Evidence.  Throughout the trial, defense counsel had raised by innuendo the refrain – heated at times – that there was something wrong with the Government's manner of collecting and presenting evidence.  No such conduct led to suppression of evidence, nor did the Court determine that any evidence had been gathered improperly.  By admitting certain testimony and documents into evidence, on occasion over Defendant's objection, the Court was determining that such evidence was admissible and, therefore, lawful.

Instructions are to be read as a whole.  The Jury was continually instructed that it was free to disregard any or all evidence, to give it such weight, if any, as the Jury found to be warranted, and to make its own independent findings of credibility.  The Court's Instruction Number 14 was a correct statement of the status of the evidence which was produced by lawful means.  Nothing prevented the defense from arguing that the evidence was incredible, or untrustworthy, or that is should receive no weight.  This objection is overruled.

34

I.   <u>Sentencing Phase Instruction</u>

Defendant Dwyer argues that the Court improperly failed to instruct the Jury at the sentencing phase of trial that, as to certain enhancements, Mr. Dwyer and his companies were "legally distinct entities." (Def. Br. at 19.) The applicable enhancements contained in U.S.S.G. § 2F.1.1, include fraud loss, § 2T1.1(b)(1); more than minimal planning, § 2T1.1(b)(2)(A); sophisticated means, § 2T1.1(b)(6)(C); and deriving more than $1,000,000 in gross receipts, § 2T1.1(b)(8)(B).

All of Dwyer's business entities, whether the sole proprietorship (James M. Dwyer Real Estate and Investment), the wholly-owned limited liability companies (JMD-VJ Linwood, L.L.C. and VJ Homestead, L.L.C.), or the wholly owned-corporation (JMD REID VJX, Inc.) were exclusively owned and controlled by Dwyer himself. (Govt. Br. at 19-20.) And, as the Government here argues, "the pertinent factor for purposes of the  § 2T1.1(b)(8)(B) enhancements is not the entity form, but control." (<u>Id.</u> at 20 (citing <u>United States v. Bennett</u>, 161 F.3d 171, 193 (3d Cir. 1998) (affirming enhancement because defendant possessed a one hundred percent interest in the company); <u>United States v. Maack</u>, 59 F. Supp. 2d 448, 450 (E.D.Pa. 1999) (applying enhancements because defendant was the only participant and, thus, was the only one who could be attributed with the money)).)

The Court's instructions were correct and the objection is overruled.

35

J.   Counts 1 and 7 of the Second Superseding Indictment

Defendant Dwyer argues that Counts 1 and 7 should have been stricken because the testimony at trial did not support a finding by a reasonable Jury that Dwyer defaulted on the Parke bank loans owing at least $6,000,000 or that he defaulted on the Roxborough Manayunk Bank loan owing at least approximately $5,600,000. Specifically, Defendant asserts that Vito Pantileone testified that the bank's loss was actually $600,000. (Oct. 7, 2004 Tr. at 78.) Similarly, Defendant arguers that the testimony of Jerry Cotlov proves that Roxborough Manayunk Bank could never have lost $5,700,000 because "it sold off half of that loan to a consortium of three other banks within weeks of making the loan." (Def. Br. at 20; Ex. G197 at 6.)

Despite Defendant's argument, no variance exists between the Indictment and the evidence presented to the Jury at trial. (See Govt Br. at 21.) Specifically, the sale of collateral subsequent to the default date does not change the fact that a specified amount was owed to the banks and private lenders on the date of default. And, as the Indictment only charges the latter, there is no variance between it and the evidence presented at trial. (Id.) In any event, as the Government states, there is no double jeopardy concern here because Defendant was not surprised or misled at trial by the proof offered by the Government. Indeed, the Government notes, Defendant put forth the same argument to the Jury as it makes to the Court here.

All essential elements of Counts 1 and 7 were proved by ample evidence at trial and this objection is overruled.

K.   <u>Sufficiency of the Evidence</u>

Finally, Defendant contends that there was insufficient evidence upon which to sustain a guilty verdict as to any charge because the Government was not able to prove that Dwyer had the "intent to defraud." (Def. Br. at 20.) Specifically, Defendant maintains that there was no proof that Dwyer "personally provided" any of the financial information at issue, that Dwyer made any false representations to the lenders, or that he made the statements charged in Count 10. (<u>Id.</u>) As to Count 10, Dwyer alleges that there was no proof that he testified at the bankruptcy deposition that "he did not provide Mr. Hoffman with the $95,000 inventory value."

For purposes of the bank and wire fraud statutes, "intent to defraud" requires that "harm or loss to the bank must be contemplated by the wrongdoer . . . ." <u>United States v. Thomas</u>, 315 F.3d 190, 200 (3d Cir. 2002). Thus, in the first instance, a showing of intent to defraud is not by itself negated by an absence of proof of the above. In any event, as the Government argues, there was ample proof demonstrating that "during 1999 and 2000, Dwyer provided and caused to be provided false financial information to six banks and two private lenders in order to obtain at least sixteen loans totaling nearly $40 million." (Govt. Br. at 22.) Specifically, Dwyer personally signed pertinent loan documents, provided two different sets of tax

37

returns for the years 1995, 1996, 1997 and 1998, and signed false income statements after having reviewed the true company income statements with his hotel manager showing almost no profits. (Id.)  Furthermore, there was proof that Dwyer "actively participated" in meetings with Parke Bank representatives in which his false financial information was discussed.  (Id.)

Finally, as to Count 10, Dwyer did, in fact, make all of the false statements alleged in the Second Superseding Indictment. Specifically, during the deposition Dwyer was asked "Do you recall at any time telling Mr. Hoffman what value to place on the inventory on T-18?" to which he responded: "I never did.  I know that the sale was $95,000."  That testimony, as the Government claims, is the basis for the allegation in the indictment.  (Id.) The Court agrees.

Overall, there was overwhelming evidence against Mr. Dwyer at trial, from his own records, his statements, his employees, his conduct, and the actions and omissions of others whom he closely supervised, from which a reasonable jury could easily conclude, as this Jury did on all counts, that Mr. Dwyer orchestrated these frauds because he intended to do so, again and again.

**II.   CONCLUSION**

For the foregoing reasons, Defendant James Dwyer's motions for judgment of acquittal and for a new trial are denied, except that judgment of acquittal will be granted on Count 3.  The accompanying Order is entered.  Sentencing will proceed on Counts 1-8 and 10 on June 10, 2005.




**June 9, 2005**                              **s/ Jerome B. Simandle**
Date                                          JEROME B. SIMANDLE
                                              U.S. District Judge


39