IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| UNITED STATES OF AMERICA, | Crim. No. 03-155-001 (JBS) |
| v. | |
| JAMES M. DWYER, | **SENTENCING MEMORANDUM** |
| Defendant. | |

**SIMANDLE**, U.S. District Judge:

## INTRODUCTION

This Sentencing Memorandum supplements and elaborates upon this Court's reasons for determining and imposing the sentence of Defendant James M. Dwyer on June 10, 2005.

On November 29, 2004, Defendant James M. Dwyer was found guilty of six counts of bank fraud in violation of 18 U.S.C. § 1344 (Counts One, Two, Four, Five, Six, and Seven), two counts of wire fraud in violation of 18 U.S.C. § 1343 (Counts Eight and Nine), and one count of bankruptcy fraud in violation of 18 U.S.C. § 125(2) (Count Ten).  The Jury also had found Defendant guilty of false statements to a financial institution in violation of 18 U.S.C. § 1014 (Count Three), but that conviction was vacated in this Court's Opinion and Order filed June 9, 2005 due to variance between the crime charged and the crime proved, and Count Three forms no basis for this sentence.

The Jury was thereafter requested to hear evidence upon and decide whether various sentencing enhancements had been proved

beyond a reasonable doubt.  The Second Superseding Indictment also contained (post-<u>Blakely</u>)[1] Supplemental Allegations which were revealed to the Jury only after their guilt-phase deliberations were concluded.  On December 2, 2004, the Jury found several of those factors to have been proved, including (1) a total fraud loss of $14,297,000 attributable to Dwyer's bank and wire fraud violations (resulting in a base offense level of 27 pursuant to U.S.S.G. § 2B1.1(b)(1)(K); (2) that Dwyer derived more that $1 million in gross receipts from one or more financial institutions resulting in a two-level increase pursuant to U.S.S.G. § 2B1.1(b)(13)(A), and (3) that Dwyer obstructed justice by committing perjury during his testimony at trial (resulting in a two-level increase for Dwyer's bank/wire fraud violations, pursuant to U.S.S. G. § 3C1.1, and a three-level increase for Dwyer's bankruptcy fraud violation, pursuant to U.S.S.G. § 2J1.3(b)(2)).

The Supreme Court's subsequent holding in <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), determined in the first part of its

---

[1] These sentencing enhancements were presented for the Jury's consideration in light of the Supreme Court's holding in <u>Blakely v. Washington</u>, 124 S. Ct. 2531 (2004) that, with respect to the statutory sentencing system of the State of Washington, any fact necessary to a determination of an enhancement in the level of punishment beyond the base offense level unless admitted by the Defendant, must be proved to a jury beyond a reasonable doubt.  Counsel presented arguments to the jury, some supplemental evidence was introduced, and the Court gave oral and written instructions to the Jury in this sentencing phase.

decision that <u>Blakely</u> applied to the U.S. Sentencing Guidelines, which violate the Sixth Amendment if mandatorily applied to increase the minimum punishment based upon facts which are not stipulated or found by a jury beyond a reasonable doubt, but then determined in the second part that the proper remedy was to invalidate only those portions of the Sentencing Reform Act that made application of the federal guidelines mandatory, holding that the remaining Guidelines and Sentencing Reform Act provisions were valid and that the Guidelines are non-binding upon the sentencing court.  Thus, provisions of the Guidelines permitting sentencing enhancements to be determined by the judge upon a preponderance of the evidence remain intact, and proof of such facts to a jury beyond a reasonable doubt is not required in a non-mandatory sentencing scheme.  This Court has determined that it accepts and adopts each of the jury's determinations of sentencing facts, finding each is correct and is amply supported by the evidence in this case.

After <u>Booker</u>, of course, the sentencing court must consider the provisions of the Sentencing Guidelines as applied to the facts of this case, rule on any disputed Guidelines issues, and determine whether to vary the sentence from the advisory Guideline Range by way of departure or consideration of other sentencing factors in § 3553(a) which would make a sentence in the Guideline Range unreasonable.  While the Court must still

3

consider the Guideline Range and methods for determining
departures under the Guidelines' policy statements, it is
permitted "to tailor the sentence in light of other, statutory
concerns as well, see § 3553(a) (Supp. 2004)." Booker, 125 S.Ct.
at 757.  The Court is required by Booker to "consult" the
Guidelines and to consider any motions for departure much as it
did before Booker.  See e.g., United States v. Crosby, 397 F.3d
103, 113 (2d Cir. 2005), and United States v. Sierra-Castillo,
405 F.3d 932, 939 n. 5 (10th Cir. 2005).  The court's sentencing
analysis must include all factors specified by Congress in 18
U.S.C. § 3553(a), which are as follows:

> (a) Factors to be considered in imposing a
> sentence. -- The court shall impose a
> sentence sufficient, but not greater than
> necessary, to comply with the purposes set
> forth in paragraph (2) of this subsection.
> The court, in determining the particular
> sentence to be imposed, shall consider --
>     (1)  the nature and circumstances of the
> offense and the history of characteristics of
> the defendant;
>     (2) the need for the sentence imposed --
>         (A) to reflect the seriousness of
>     the offense, to promote respect for the
>     law, and to provide just punishment for
>     the offense;
>         (B) to afford adequate deterrence
>     to criminal conduct;
>         (C) to protect the public from
>     further crimes of the defendant; and
>         (D) to provide the defendant with
>     needed educational or vocational
>     training, medical care, or other
>     correctional treatment in the most
>     effective manner;
>     (3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established for--

    (A) the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines--

        (I) issued by the Sentencing Commission pursuant to section 994(a)(1) of title 28, United States Code, subject to any amendments made to such guidelines by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

        (ii) that, except as provided in section 3742(g), are in effect on the date the defendant is sentenced; or

    (B) in the case of a violation of probation or supervised release, the applicable guidelines or policy statements issued by the Sentencing Commission pursuant to section 994(a)(3) of title 28, United States Code, taking into account any amendments made to such guidelines or policy statements by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28);

(5) any pertinent policy statement--

    (A) issued by the Sentencing Commission pursuant to section 994(a)(2) of title 28, United States Code, subject to any amendments made to such policy statement by act of Congress (regardless of whether such amendments have yet to be incorporated by the Sentencing Commission into amendments issued under section 994(p) of title 28); and

    (B) that, except as provided in section 3742(g), is in effect on the date the defendant is sentenced.

> (6)   the need to avoid unwarranted
> sentence disparities among defendants with
> similar records who have been found guilty of
> similar conduct; and
> (7)   the need to provide restitution to
> any victims of the offense.

The resulting sentence must be "sufficient, but not greater than necessary, to comply with the purposes set forth" in subsection (2), _supra_.

In the present case, this Court consulted the Sentencing Guidelines, applied the appropriate grouping rules for the nine counts of conviction, and determined that the Total Offense Level is 31, the Criminal History Category is I, and the advisory Guideline Range is 108 to 135 months of imprisonment, as discussed further below.

The Court then considered Defendant's motion for downward departure based upon extraordinary family responsibilities under U.S.S.G. § 5H1.6.  The grounds for this motion, set forth in the extensive "Sentencing Memorandum and Motion for Downward Departure" (hereinafter "Def. Sent. Mem.") and attachments thereto, were argued by defense counsel, opposed by the government in the Letter of AUSA's Thomas DiLeonardo and R. Joseph Gribko dated June 9, 2005, and ultimately denied by the Court at the sentencing hearing.  The discussion below elaborates upon issues pertinent to this departure motion.

Finally, the Court gave explicit consideration to all other sentencing factors under § 3553(a), _supra_, and determined that a

sentence at the lower end of the advisory guideline range was appropriate, fair, and reasonable, and it was no greater than necessary to comply with the purposes of sentencing set forth in § 3553(a)(2), <u>supra</u>, all as discussed below.  The Court imposed a sentence of 108 months of imprisonment, concurrent on each of Counts One, Two, Four, Five, Six, Seven, Eight, and Nine, together with 48 months' imprisonment on Count Ten to be served concurrently with the other counts, plus five years of supervised release, plus restitution to the eight victim financial institutions in the total amount of $17,469,284.00.

A.   <u>Consideration of the Guidelines</u>

The Sentencing Guideline computations are set forth in detail in the Revised Final Presentence Investigation Report ("PSR") dated June 9, 2005.[2]

The financial crimes in Counts One, Two, Four, Five, Six, Seven, Eight, and Nine were grouped together.  The PSR correctly computed the amount of loss by taking the principal amount of each fraudulent loan and offsetting it for all payments, the proceeds from sale of collateral, and any deposits or settlements, as explained in PSR ¶¶ 61-63.  The calculations

---

[2] The Revised Final PSR of June 9, 2005 superseded the original Final PSR of March 1, 2005, making changes with a double asterisk (**), reflecting the Court's entry of judgment of acquittal on Count 3 (filed June 9, 2005) as well as the most recent restitution figures crediting Defendant with proceeds of loan collateral sold.

excluded the second loan from National Penn Bank and the losses
to subcontractors arising from their non-receipt of payments
under that construction loan, because such losses were implicated
in Count Three, as to which judgment of acquittal was entered on
June 9, 2005.  Defendant's counsel objected to the loss figures
as not reflecting the fact that all loans were collateralized by
real estate, some of which still remains to be sold.  Defendant
has offered no specific alternative figures for computing loss or
valuing unsold collateral.  The PSR has correctly been updated to
give credit for such collateral and to reflect the current
selling price for remaining collateral.  See PSR ¶¶ 61-75.

The net loss determinations of ¶ 61 pertaining to National
Penn Bank ($2,826,813), First Republic Bank ($2,290,000), Amresco
Commercial Finance Corporation ($7,669,421) and Cambridge Holding
($997,042) yield a total figure of $13,783,276.

The loss figures for the remaining victims, although not put
to the jury separately, have also been computed using the same
methodology above, giving Defendant credit for the value of all
collateral and prior payments, as set forth in PSR ¶ 62, as
follows:  Parke Bank ($504,679), Third Federal Savings Bank
($872,000), Willow Grove Bank ($100,000), and Roxborough-Manayunk
Bank ($2,209,329), yielding a further loss figure of $3,686,008.
Therefore, the base offense level of seven (U.S.S.G. §
2B1.1(a)(1)(2004)) must be increased 20 levels (U.S.S.G. §

2B1.1(b)(1)(K) (2004)) because the loss was more than $7,000,000 and less than $40,000,000.  This Court finds, further, as did the Jury, that Defendant Dwyer derived more than $1 million in gross receipts from more than one financial institution, increasing the offense level by two levels (U.S.S.G. § 2B1.1(b)(13)(A)).

It is significant that Mr. Dwyer also committed perjury at trial.  This Court finds, as did the Jury, that the United States has proved beyond a reasonable doubt that Mr. Dwyer knowingly gave false testimony upon highly material subjects at trial, namely, each item stated in the United States' "Notice of Sentencing Factor in re Obstruction of Justice" dated November 30, 2004.[3]  Beyond those specifics, the Court finds that Mr.

---

[3] Following the guilt phase of trial, the United States alleged in its Notice of Sentencing Factor in re Obstruction of Justice that Mr. Dwyer committed perjury in his November 17, 2004 testimony at trial in these particulars:

1.   When James M. Dwyer signed the documents that contained financial information, which he provided or caused to be provided to banks in support of his loan applications (i.e. Government's Exhibits 41, 42, 43.1 (tabs 1 and 2) 74, 163), he believed that financial information to be accurate, as set forth in the transcript on page 153 line 12-17; page 155 line 7.

2.   That he believed that the financial information contained in the documents that he provided or caused to be provided to the banks was accurate, as set forth in the transcript on page 160 lines 14-23; page 162 lines 2-12.

3.   That he was unaware that Frank Gallo did not prepare the balance sheets that were supplied to Parke Bank (i.e. Gov. Ex. 45 (tabs 1, 2 and 3)),

9

Dwyer's testimony fabricated his disclaimer of personal knowledge of the falseness of his signed income tax returns and other financial statements which were submitted to the various victim financial institutions in support of his fraudulent loan applications, as he claimed not to have noticed the millions of dollars in disparities between his income as declared to the IRS on the one hand and the financial institutions on the other.  His testimony that he had no idea of his true income or of the fabricated amounts he submitted on the false Form 1040's and other financial statements in support of his loans was not only a lie but something this Court observed to be a pathetic attempt to deceive the Jury.  The Guidelines provide a two-level enhancement for perjury (U.S.S.G. § 3C1.1) and a three- level enhancement for perjury at trial in connection with bankruptcy fraud (U.S.S.G. § 2J1.3(b)(2)).

The total offense level upon the grouped counts of bank fraud and wire fraud in Counts One, Two, Four, Five, Six, Seven, Eight, and Nine was 31 (see Revised Final PSR ¶ 90), and upon the

---

as set forth in the transcript on page 156 lines 16-18; and

4.   That he and his son Brendan went to Deborah Constant's office on April 3, 2001, and that they signed and notarized the inventory and bill of sale on that date, as set forth in the transcript on page 92 lines 2-18.

Id.  The Jury found, beyond a reasonable doubt, that these allegations of obstruction of justice were proven.

single grouped count of bankruptcy fraud in Count Ten, it was 15 (id. at ¶ 96).  Using the standard grouping rule of the multiple count adjustment (see U.S.S.G. § 3D1.4), the total offense level for all counts was again, only 31, essentially providing no incremental increase for the bankruptcy fraud in Count Ten over the bank frauds and wire frauds in the other counts of conviction.

       B.   Defendant's Motion for Downward Departure

     Mr. Dwyer, through counsel, submitted a motion for downward departure based upon extraordinary family responsibilities. Since the departure mechanisms of the Guidelines are left intact after Booker and form part of the body of Guidelines law which this Court must consult at sentencing, this Court carefully consulted and applied the guidance governing a claim of extraordinary family responsibilities in U.S.S.G. § 5H1.6 (2004), which states:

           §5H1.6.   Family Ties and Responsibilities
           (Policy Statement)

           In sentencing a defendant convicted of an
           offense other than an offense described in the
           following paragraph, family ties and
           responsibilities are not ordinarily relevant
           in determining whether a departure may be
           warranted.

           In sentencing a defendant convicted of an
           offense involving a minor victim under section
           1201, an offense under section 1591, or an
           offense under chapter 71, 109A, 110, or 117,
           of title 18, United States Code, family ties
           and responsibilities and community ties are

11

not relevant in determining whether a sentence
should be below the applicable guideline
range.

Family responsibilities that are complied with
may be relevant to the determination of the
amount of restitution or fine.

The Application Note, set forth in the margin,[4] gives

_____

[4] Application Note 1(B) to U.S.S.G. § 5H1.6 provides as follows:

> (B) <u>Departures Based on Loss of Caretaking or Financial Support</u>.--A departure under this policy statement based on the loss of caretaking or financial support of the defendant's family requires, in addition to the court's consideration of the non-exhaustive list of circumstances in subdivision (A), the presence of the following circumstances:
>
> (i)   The defendant's service of a sentence within the applicable guideline range will cause a substantial, direct, and specific loss of essential caretaking, or essential financial support, to the defendant's family.

additional guidance on the consideration of departures based on loss of care taking or financial support.

Defendant asserts that the Dwyer family circumstances are "extraordinarily tragic" and that the family "will unquestionably suffer devastating consequences if Mr. Dwyer is incarcerated for any substantial period of time." (Def. Sent. Mem. at 4.)  Mr. Dwyer is said to provide critical physical, emotional, and financial support to dependent members of both his immediate and extended family. (Id. at 2.)

Mr. Dwyer is 63, was married to his wife Margaret in 1968, and has four children:  James ("Josh"), age 31; Brendan, age 28;

———————————

        (ii)   The loss of caretaking or financial support substantially exceeds the harm ordinarily incident to incarceration for a similarly situated defendant. For example, the fact that the defendant's family might incur some degree of financial hardship or suffer to some extent from the absence of a parent through incarceration is not in itself sufficient as a basis for departure because such hardship or suffering is of a sort ordinarily incident to incarceration.

        (iii)  The loss of caretaking or financial support is one for which no effective remedial or ameliorative programs reasonably are available, making the defendant's caretaking or financial support irreplaceable to the defendant's family.

        (iv)  The departure effectively will address the loss of caretaking or financial support.

Peter, age 24; and Meghan, age 20.  Mrs. Dwyer works as a registered nurse.

Except for Josh, who developed an inoperable brain tumor in 1990 and currently receives SSI benefits and is dependent upon home care, as discussed in greater detail below, there is no evidence that Mr. Dwyer's other three adult children are unable to care for themselves.  Brendan works full time in the family real estate business and has had the opportunity to "learn the ropes" from Mr. Dwyer as this prosecution has progressed to sentencing; he has received treatment for a back injury suffered on December 14, 1997 and is seen regularly at Magee Rehabilitation Hospital's Outpatient Clinic, but does not require any special assistance by his family.  (Def. Sent. Mem., Ex. C, Letter of William E. Staas, M.D.).  Son Peter is a college student at Northern Arizona University, and Meghan is on temporary leave from college due to an emotional condition, and she plans to resume her college studies at Northern Arizona University alongside Peter.  (PSR ¶ 121.)

There is little evidence that Mr. Dwyer has provided financial assistance to these family members in recent years. Although self-employed as the owner and operator of James M. Dwyer Real Estate Equities International headquartered in Ocean City (PSR ¶ 132), he has reported no income to the Social Security Administration since 1999 (PSR ¶ 139), and he confirmed

at the sentencing hearing that he has had no income from 2003 until the sentencing date.  Although indicating orally at the sentencing hearing that he has earned some income from real estate commissions, Defendant's personal financial statement submitted to the Probation Department reflected no income for Mr. Dwyer (PSR ¶ 140).  His properties have been tied up in bankruptcy since 2001, the family's home has been lost to foreclosure, the family business (James M. Dwyer REEI) has apparently produced no earnings for several years, nor has Mr. Dwyer filed tax returns during this period.  He blames the Bankruptcy Trustee for his alleged inability to file personal income tax returns in recent years.  Thus, the source and existence of his purported financial support to dependent family members remained a mystery, which Mr. Dwyer was unable to satisfactorily explain at the sentencing hearing.  He merely explained that his children -- who are supposedly dependent upon him -- lent him money.  His claim now that a period of substantial incarceration will cause a financial hardship upon his wife and children is unsubstantiated and the Court rejects this basis for departure.  Moreover, the dire financial straits in which defendant's family finds itself are not the result of his incarceration, as he had not spent a day in jail and nothing prevented him from working and earning income for the years since declaring bankruptcy in 2001.  The decline in income is the

16

result of his business failures.  Furthermore, as demonstrated at
trial, his actual business income since about 1996 was nowhere
near as high as  he falsely professed it to be.

Of greater moment is the impact of sentencing upon the
serious medical and emotional needs of son Josh, detailed in Def.
Sent. Mem. Ex. A (Chronology dated Mar. 1, 2005 by Margaret
Dwyer, and letters of H. Warren Goldman, M.D., Ph.D dated July 7,
2003 and Mar. 7, 2005).  Josh's condition and Mr. Dwyer's role in
providing daily care and emotional support were also explained in
the Letter of Josh Dwyer dated Mar. 9, 2005, and the letter of
Margaret Dwyer dated Mar. 1, 2005 (Def. Sent. Mem. Ex. E).  Josh
was diagnosed with a benign brain tumor in 1990 and underwent
chemotherapy, several significant brain surgeries, and radiation
therapy in the early 1990's, and was able to graduate from
Rutgers in 1996.  In 1997, he had cataract surgery on both eyes,
and repeated muscle surgery on both eyes in 1998 or 1999.  In
2000, a cyst was detected to be forming next to the brain tumor
and several surgeons ruled out surgery and subsequently, dosages
of painkillers and of Ritalin were increased.  Symptoms of left-
sided weakness and limping seemed to improve in 2001 and Josh
discontinued all medications.  By 2003, symptoms reappeared and
on January 30, 2003, he had a craniotomy with partial resection
of the brain tumor.  Dr. Goldman stated that his post-operative
recovery was difficult but that he was pleased with Josh's

17

progress in rehabilitation as of April, 2003.  By March, 2005, after increasing difficulty with falling, headaches, and speech, Dr. Goldman revised Josh's shunt from 15 years ago, placing a new system, resolving the subdural condition and promoting shrinkage of the enhancing component of his mid-brain tumor, resulting in clinical improvement.  For example, headaches had resolved, speech was a little bit better, and he was more stable, according to Dr. Goldman.  (See Def. Sent. Mem. Ex. A, Goldman Ltr., Mar. 7, 2005.)  Mrs. Dwyer reported on March 1, 2005, a bleaker picture than Dr. Goldman's contemporaneous view, noting that Josh continues to need help with his activities of daily living, that he requires constant monitoring to protect against falls, and that he is emotionally fragile and suffers from panic attacks. She states, as Josh himself does in his letter of March 9, 2005, that Mr. Dwyer's presence is needed for Josh's well-being because they are very close to one another.

During the 15 years of Josh's living with the tumor and its complications, he has lived in the family home where Mr. and Mrs. Dwyer, Meghan, and Brendan also live.  Josh was significantly disabled during the period of Mr. Dwyer's numerous crimes.  Each helps care for Josh.  Josh's mind is described as sharp, but his speech and steadiness are diminished.  His cost of medical care is covered by Medicaid insurance in connection with his SSI benefits.

18

This Court has carefully considered what Mr. Dwyer's absence
may mean for Josh's well-being, and whether the circumstances
call for a reduced sentence.  The Defendant has the burden of
demonstrating that such a departure is warranted, United States
v. Higgins, 967 F.2d 841, 846 (3d Cir. 1992), and that the
particular hardship to family members is significantly beyond the
normal impacts of incarceration, United States v. Gaskill, 991
F.2d 82, 85 (3d Cir. 1993).  The Court of Appeals has held that
"a District Court has the discretion to grant a downward
departure when the family circumstances lie outside the
parameters of what is ordinary, when the departure would not
conflict with the purposes underlying sentencing."  United States
v. Dominguez, 296 F.3d 192, 194 (3d Cir. 2002) (sentencing judge
erroneously believed he lacked discretion to grant downward
departure).  The defendant does not have to prove that his
family's hardships would be unique or "extra-extraordinary," but
rather whether the circumstance is unusual enough to warrant
departure, which is a matter committed to the sound discretion of
the sentencing court.  United States v. Dominguez, 296 F.3d at
195.  Determining what is "exceptional in existing case law," as
the Court of Appeals indicated in Dominguez at 196, requires the
sentencing court to compare the circumstances of the present case
with precedent cases.  The Court has done so here.

19

In Dominguez itself, the sentencing court upon remand would
have discretion to consider a departure for the defendant who was
the unmarried only child of infirm parents who resided with her
and were financially and physically dependent upon her, being
unable to afford paid assistance.  Her father, who had brain
surgery and a heart attack, was non-ambulatory, obese,
incontinent, and had a significantly impaired mental ability,
while her mother had severe arthritis and heart problems which
prevented her from physically caring for her husband.  Id. at
194.  It appeared that defendant's services to her elderly,
infirm parents were irreplaceable, as no other family members or
friends or other caretakers were in the picture.  The defendant's
culpability for the crime of conviction in Dominguez, on the
other hand, was not aggravated; she was a bank employee who
agreed with a new customer to permit him to open accounts in
different names, which was a device that aided the customer's
money laundering for which Ms. Dominguez achieved no personal
financial gain, making it difficult to even understand her
motivation other than as an attempt to cultivate a new bank
customer.  Id. at 194.  Coupled with defendant's contrition, lack
of criminal history, and mental health counseling, id at 200, the
trial court would be free to conclude that need for incarceration
to serve the purposes of sentencing -- deterrence,
incapacitation, just punishment, and rehabilitation -- is fully

served by a reduced sentence.  Unlike Dominguez, defendant Dwyer committed a lengthy series of frauds causing multiple victims to lose nearly $20 million, lied in his bankruptcy deposition, lied to the jury about his role in these many crimes, and expresses no regret other than to fabricate that an unfaithful employee (McKeever) purportedly caused these things while on Dwyer's watch without his knowledge or approval.  Dwyer's assistance to his son, Josh, has been steadfast and commendable but not irreplaceable.  Mrs. Dwyer remains able to care for Josh, as do adult siblings Brendan and Meghan, as well as a plethora of immediate relatives and friends in the area, several of whom wrote letters to the Court; Josh's medical costs are paid by other sources, and this family's circumstance does not come close to the extraordinary situation in Dominguez.

A departure was likewise justified in Gaskill, supra, in which the defendant, convicted of credit fraud, was the sole caretaker for his mentally ill wife who was unable to keep a checkbook, had no personal friends, and no contact with members of the extended family.  991 F.2d at 83-84.  Defendant performed all household chores, administered his wife's medications, and was totally responsible for his wife's well-being.  Such a situation was outside the ordinary, permitting departure in the court's discretion, and the trial court erred in failing to recognize that this situation went well beyond the normal

circumstance of a defendant's need to care for a family member.
Id. 991 F.2d at 84.  Measured against the hardship which would be
visited upon Mrs. Gaskill, for whom the defendant's services were
indeed irreplaceable, Josh Dwyer's need for defendant Dwyer's
presence and assistance is not irreplaceable, as other adults in
this close-knit family will be available to assist.  Where Mrs.
Gaskill literally had no one else to help her survive, Josh Dwyer
fortunately has a loving family and ongoing medical attention to
help ease the loss of his father's daily assistance.  Defendant
Gaskill falsely used the social security number of his son on job
applications because he was unemployed and used the social
security numbers of others to obtain credit cards and run up
$60,000 in unpaid charges, warranting a sentence of just four
months incarceration in a  halfway house, such that a rather
slight departure would accommodate his wife's extraordinary
needs.  Unlike Gaskill, defendant Dwyer, who had been a
successful developer, committed enormous frauds upon multiple
victim institutions out of greed and a sense of self-
aggrandizement and would merit a sentence in the range of 108 to
135 months in the absence of a departure or other mitigating
circumstances under 18 U.S.C. § 3553(a), supra.  Unlike Gaskill,
where the court recognized "the lack of any end to be served by
imprisonment other than punishment" and "the lack of any threat
to the community," id at 86, Mr. Dwyer's incarceration is well-

22

deserved as punishment, deterrence, and the protection of society from his future prospect of more crimes.  The circumstances here do not warrant any substantial departure in order to preserve the continuity of care for Josh.

Other cases cited by Defendant are similarly unhelpful because his family's hardships, by comparison, will be far less aggravated due to his imprisonment.  In <u>United States v. Johnson</u>, 964 F.2d 124 (2d Cir. 1992), the defendant was solely responsible for the upbringing of four young children; she was a single mother of an institutionalized daughter whose six-year old child resides with defendant, together with defendant's son and his two children (aged 6 and 5), and defendant's own five-month old baby. <u>Id</u> at 126.  The sentencing judge's downward departure was affirmed.  Defendant Johnson's underlying crime involved a scheme to inflate paychecks and receive kickbacks, amounting to $89,222, which was split among the participants including Johnson.  The sentencing judge departed downward from level 23 by three levels because the court found that the level for bribery overstated the seriousness of this crime, and by 10 levels for family hardship under § 5H1.6, to level 10 and imposed six months home detention and restitution of $27,973.  <u>Id</u>. at 126.  She found "extraordinary parental responsibilities," beyond "even those of a single parent."  <u>Id</u> at 129.  To impose a guideline sentence upon Johnson would be "to wreak extraordinary destruction on

23

dependents who rely solely on the defendant for their
upbringing." Id at 129. Thus, a sentence which would have been
determined by level 20 (33-41 months) ended up with home
confinement to ameliorate the extraordinary family hardship.
Unlike the Johnson family, in which four children and one
grandchild would suffer destruction of their upbringing, the
Dwyer family's hardship caused by Mr. Dwyer's incarceration is
not outside the ordinary and can be ameliorated through normal,
available means of other adult family members and close friends.

Likewise, in United States v. Alba, 933 F.2d 1117 (2d Cir.
1991), the court highlighted the importance of avoiding the
destruction of defendant Gonzalez's close-knit, dependent family
having two minor children, the defendant's disabled father, and
grandmother. The sentencing court was held to not have abused
its discretion in departing downward from a range of 41-51 months
on the grounds that Gonzalez's role in a drug conspiracy offense
was "less than minimal" and because of family hardship, but
remanded for re-sentencing because other grounds for departure
were incorrect. At the time of the events, Gonzalez worked two
jobs. The available record is too sketchy to ascertain whether
Gonzalez's support of his family's well-being was irreplaceable,
but it implies as much since incarceration was held likely to
cause "destruction of an otherwise strong family unit." Id. at
1122. Again, for reasons stated already, the impact of

24

incarceration on Gonzalez's family, coupled with his "less than minimal" role in the drug transaction, justified this basis as just one of four that the trial court used to depart downward by about 41 months, and such unusual hardship is not shown in the present case.

Even a distinct hardship to the family resulting from a defendant's incarceration will not necessarily be deemed extraordinary, as in United States v. Sweeting, 213 F.3d 95 (3d Cir 2000), in which the sentencing judge granted a substantial downward departure due to defendant being the single parent of five children including one with Tourette's Syndrome who needed special care.  The Court of Appeals reversed, determining that the sentencing court abused discretion where the degree of care actually provided for the child with Tourette's Syndrome was unknown, the defendant was a recidivist, and defendant's children "will suffer the same type and degree of injury felt by any family where the parent is incarcerated."  Sweeting, 213 F.3d at 108.  Nothing in the record indicated that defendant Sweeting was so irreplaceable that her otherwise ordinary family ties and responsibilities [were] transformed into the 'extraordinary' situation warranting a departure."  Id. at 107.  Defendant Sweeting was involved in high volume drug dealings and there was "some question whether the best interests of the children would

be served by allowing them to remain under the care of the defendant." Id. at 111.

The denial of a downward departure will not amount to an abuse of discretion despite undeniably difficult family circumstances, such as United States v. Headley, 923 F.2d 1079, 1083 (3d Cir. 1991) (defendant was a single mother of five children, but family's circumstances were not outside the normal consequences occurring when the parent is imprisoned).  It is in the District Court's discretion to determine whether a reduced sentence, where non-ordinary family obligations are present, serves the purposes of sentencing in the individual case, and thus "has a penal valence equal to the crime."  United States v. Dominguez, 296 F.3d at 200.

Even when the suggested Guideline Range sentence is very lengthy, as in this case, this Court recognizes that the sentencing court is not presented with an "all or nothing" choice when considering a departure under § 5H1.6.  Thus, a sentencing court is not confronted with the dilemma of reducing incarceration to zero or not departing at all, and a reduced sentence which still involves some incarceration may be appropriate where the degree of amelioration of hardship is justified.  Id at 200 n. 21.  This Court has indeed also considered whether a reduction of the suggested term of imprisonment to some intermediate level due to family hardship

26

would strike the proper penal valence equal to the crime, and I concluded it would not.

This Court denied the downward departure motion under § 5H1.6, in summary, because the hardships caused to the Dwyer family through defendant's incarceration will not be significantly greater than normal where a parent and principal breadwinner is imprisoned.  Mr. Dwyer will, during his incarceration, leave behind a close, intact family and many relatives and friends, having a collective strength and resources substantially greater than most defendants' families.  Josh's medical needs are being met as his condition has been stable or even improving slowly according to his doctor.  Defendant's wife and three other adult children will help Josh.  The financial calamity to the Dwyer family from the collapse of the family business is not unusual, since that business was an instrument of Dwyer's frauds on his victims.  Moreover, due to its numerous defaults over the years, the business was failing long before this sentencing occurred and has produced no reported income in years.

It would be ironic indeed if this court were to shorten defendant's sentence so that he could rebuild his business that was destroyed by his own poor decisions, fraud, and criminality. The family has also derived at least indirect benefit from Dwyer's frauds as he supported a luxurious lifestyle for his

spouse and adult children even while his business was generating income for him supported to some extent by the proceeds of fraudulent loans to his sole proprietorships and solely-owned corporations.  If Dwyer's filed personal income tax returns for 1997, 1998, and 1999 were accurate, showing the cumulative loss of millions of dollars in those years, then his financial empire was something of a house of cards requiring infusion of substantial capital through the millions in fraudulent loans in the latter years.  One may legitimately wonder how much of the largesse he bestowed in financial support upon his family and friends and charities was the product of fraud in the recent years, since his filed returns reflected a continual financial struggle.  The hardships now being endured by Mr. Dwyer's family are not extraordinary and relate directly to his serious and prolonged criminality, false blaming of others, false portrayal of the success of his business ventures, bankruptcy fraud, and unrelenting hubris in the face of obvious personal responsibility.

    C.   Consideration of All Sentencing Factors under § 3553(a)

    Mr. Dwyer's sentence must be "sufficient, but not greater than necessary, to comply with the purposes set forth" in § 3553(a)(2), supra, which include reflecting the seriousness of the offense, promoting respect for the law, providing just punishment, affording adequate deterrence to criminal conduct,

protecting the public from further crimes of the defendant, and providing defendant with needed education training, medical care, or other treatment.  This Court has done so and imposed the appropriate sentence in light of all the considerations expressed at the sentencing hearing and elaborated herein.

    1.    The Sentencing Guidelines and Policy Statements

    Application of the advisory Sentencing Guidelines regime, as discussed in detail above, yielded a recommended sentence in the range of 108 to 135 months of imprisonment.  The United States argued that a sentence in this range was appropriate and reasonable, while defense counsel argued at the sentencing hearing that the relevant fraud guidelines overstate the seriousness of Dwyer's crimes, skewing the sentence upward.  Counsel based this argument on the premise that the Sentencing Commission, in formulating the Guidelines, looked at the average lengths of sentences imposed rather than the customarily much shorter average lengths of sentences served during the pre-1988 era, failing to make adjustments accordingly in the Sentencing Reform Act's regime abolishing parole and requiring real-time sentencing.[5]  That argument is incorrect.  The Sentencing

---

[5] Counsel cited to a transcript of a sentencing hearing in United States v. Clifford Taliaferro, 03-CR-00733-JF-1 (E.D. Pa., Jan. 20, 2005) before the Honorable John P. Fullam.  Judge Fullam stated that he believed that "the whole guideline structure is skewed upward" based on his recollection of attending early training seminars which indicated to him that the Sentencing Commission's analyses had taken into account only the sentence

Commission's original commentary in 1987, set forth following U.S.S.G. § 1A1.1 (2004), carefully stated the basic principles and premises of the then-new Guidelines.  The Commission sought to serve the goal of honesty in sentencing by recognizing that the effective length of the sentence imposed is typically reduced by about two-thirds due to parole decisions.  (Id. at ¶ 3.)  It studied the results of sentencing in about 10,000 federal cases, from the presentence investigation and sentencing through ultimate release on parole.  (Id.)  The sentencing ranges for each offense were based upon sentences served, not sentences imposed, as the Commission made clear:  "In determining the appropriate sentencing ranges for each offense, the Commission began by estimating the average sentences now being served within each category."  (Id. ¶ 4(g)).  Thus, Defendant is mistaken to argue that the existing guidelines skewed sentences upward by using sentences imposed, rather than sentences served, as the yardstick.

If anything, the guidelines for multiple crimes of fraud against different victims, as in this case, understate the harms caused because the incremental punishment for each additional crime (and for additional millions of dollars of harm to the next victims) is greatly reduced as one moves up the offense levels.

---

imposed, not the sentence served."  (Taliaferro Tr. Jan. 20, 2005 at 9-10.)  Judge Fullam further observed, importantly, that even if that were so, the result was endorsed by Congress.

By simply adding the victims' loss or intended loss to produce
the aggregate figure of $17,469,284, the result of simple
addition placed the harm into a broad range of "more than
$7,000,000 but less than $40,000,000," increasing the base
offense level by 20 levels pursuant to U.S.S.G. § 2B1.1(b)(1)(K)
(2004).  The loss Dwyer's fraud caused to just one financial
institution -- Amresco Commercial Finance Corp. in the amount of
$7,669,421 -- would have sufficed all by itself to place Dwyer
into this same loss bracket under the Guidelines before the other
seven institutions' losses are even considered.  The defendant's
derivation of more than $1 million in gross receipts from more
than one financial institution is recognized by an additional two
level increase under U.S.S.G. § 2B1.1(b)(13)(A), but the fact
that he is culpable for defrauding eight different financial
institutions, not just two, is not recognized by a further
increase.  Finally, the Guidelines themselves provide for no
incremental punishment for the bankruptcy fraud of Count Ten
which, while itself a serious crime against bankruptcy creditors,
is merely grouped with the eight financial institution frauds
which had occurred in prior years, by virtue of the grouping rule
of U.S.S.G. § 3D1.4.  This grouping rule essentially assures in §
3D1.4(c) that, because Count Ten is scored as more than nine
levels less than the group of financial institution fraud crimes,
there will be no increase in the applicable offense level, but

this fact "may provide a reason for sentencing at the higher end of the sentencing range for the applicable offense level." §3D1.4(c).

In the aggregate, then, the Sentencing Guidelines, as applied to Mr. Dwyer's conduct, may actually <u>understate</u> the overall harm to victims and culpability of the defendant.

> 2.   <u>Nature and Circumstances of the Offense and History and Characteristics of the Defendant</u>

These considerations were largely set forth in the PSR, and will not be repeated here.  In addition, the Court acknowledges the impressive support for Mr. Dwyer in letters received from friends, family, business associates, a few employees, clergy, and persons in public life (Def. Sent. Mem. Ex. E).  These numerous testimonial letters describe an individual who is "uncommonly charitable, consistently selfless, and remarkably beneficial to the societies in which he has lived," according to Def. Sent. Mem. at 12.  His closeness to his immediate and extended family is a repeated attribute, as is his devout practice of faith.  His past success as a developer draws many favorable and admiring comments, as does his history of charitable works toward churches, non-profit organizations and educational institutions.

The crimes for which he was convicted were seen by many writers as being out of character or aberrational in an otherwise exemplary life.  Many writers, as was true of the dozens of

character witnesses who testified for him at trial, attested to his reputation for honesty and integrity.  Very few writers, principally his wife, made any comment about the nature of these offenses.

All of these accolades speak well of his character and reputation in the community.  There was another side to Mr. Dwyer's character, however, which was apparently unknown to (or at least unacknowledged by) any of these friends, family, and character witnesses.  In major financial transactions over the years, he was a fraud.  Despite his prior success and ability to generate large sums of income, Mr. Dwyer has failed to file personal income tax returns in many years, and in others such as for 1996-98 (disclosed at trial), he filed returns showing huge negative income.  For example, the testimony at trial proved that as long ago as 1990, when obtaining a mortgage on his home from Jersey Shore Savings Bank, he submitted bogus financial information under cover of a forged independent accountant's letterhead and signature, including submitting copies of robust personal income tax returns for 1987 and 1988 when in reality, no such returns were ever even filed with the IRS for those years. Dwyer's conduct, while admitted into evidence at trial for limited purposes consistent with Rule 404(b), Fed. R. Ev. (see Memorandum Opinion filed Oct. 18, 2004), is considered for sentencing purposes for what it also shows about his truthfulness

-- that he would cause forged documents to be submitted to the bank, forging even the name of his own long-time accountant Ellis Rubin, CPA, to obtain loans and to cover up the fact that, despite his renowned financial success, he was not filing his tax returns.  A decade later, he employed the similar scheme in the fraudulent loans for which he was convicted, including forgery of his accountant's preparation and approval of fraudulent financial statements and tax returns.  He managed to pay back the 1990-91 Jersey Shore Savings Bank loan without his fraud being detected. He was not so lucky with the eight financial institutions as to which his frauds came to light and for which he stands convicted.

Dwyer's character was also revealed to include self-aggrandizement, submitting numerous false financial statements of many millions of dollars of personal net worth and trading on his prior excellent business reputation to obtain loans that neither he nor his business could ever afford, all as proved at trial. Even as his business was failing, he launched more projects, requiring still more debt; he was unwilling to cast aside the pretense of enormous wealth.  Perhaps vanity did not permit him to acknowledge that his business was failing and his projects should be reduced.

His character, importantly, was also revealed by his lies on the witness stand at trial in his attempts to blame others for his crimes, especially if the others were deceased.  These

34

character flaws, beginning with inability to admit to business

failure, proceeding through the pretense that he was somehow

distant and unknowledgeable about his own financial affairs in

his sole proprietorships and closely-held limited corporations,

advancing through blaming underlings who had no financial

motivation for submitting the false documents which he himself

had endorsed, produced testimony that was unbelievable.  It was

the attempt of a salesman to "snow" the jury, in testimony that

began, ironically enough, with his observation that he is a

salesman who has taught sales and succeeded greatly in sales over

the years.  (Tr. Nov. 10, 2004.)  In any event, Mr. Dwyer chose

to blame others and to deny completely any role in submitting the

false loan application documents that even contained his

acknowledged signatures.  That Mr. Dwyer topped all this off by

seeking the protection of the bankruptcy court (which is his

right) and then committing bankruptcy fraud further shows that

his crimes were not an aberration.  In short, in considering Mr.

Dwyer's character, the Court is left with the conclusion that he

presents deeply conflicting features, in which, like most people,

he is neither as virtuous as his supporters would claim, nor as

arrogant and pathological as his worst deeds reveal.

In sum, this Court found that nothing about his character or

history, or the nature of these offenses, would call for a

sentence above or below the recommended guideline range.  Within

that range, the nature of these offenses would tend to somewhat elevate the sentence and Mr. Dwyer's reputation for generosity and community works would tend to somewhat decrease it, all within the advisory range.

3.    Need to Protect from Future Crimes of the Defendant

Defendant Dwyer was proven to have committed a lengthy series of very serious crimes which he blames on others.  The failure to come to grips with one's own criminal conduct, as well as the serial nature of these crimes over the years, are factors that indicate need for specific deterrence.  Incarceration for a substantial period will protect the public by separating Mr. Dwyer from such opportunities during this time, and hopefully after release.

4.    Need for Sentence to Reflect Seriousness of Offense, to Promote Respect for the Law, to Provide Just Punishment, and to Afford Adequate General Deterrence

The Court has found that a sentence of at least 108 months was necessary to reflect the seriousness of Defendant's crimes, to promote respect for the law, to provide just punishment, and to afford adequate general deterrence.  The law applies alike to every one.  This Court is cognizant that many individuals, especially those who have committed drug crimes for which mandatory minimum sentences of 10 years apply under 21 U.S.C. § §§ 41(b)(1)(A),[6] may have had fewer choices in life and may have

_____

[6] An example would be a person who played a minor or minimal role in the distribution of 50 grams of crack cocaine, or 50

been culpable for less harm to society than Mr. Dwyer, who faces a recommended term of 108 to 135 months.  Fraud offenses are not uncommon, and the Sentencing Commission has erected a sensible elevated punishment range for the most serious of such crimes when measured in monetary value.  A lesser sentence would diminish respect for the sentencing authority if it would give the appearance of undue leniency because these extraordinary fraud crimes were committed by someone of high position in the community, while harsher sentences are reserved for the anonymous.  Respect for the law is further served by imposing this sentence similarly in this case as for like offenders convicted of like fraud crimes, as reflected in the accumulated wisdom and refinement of the Sentencing Commission's fraud guidelines.

General deterrence is served by a substantial sentence which may suffice to cause a businessperson to hesitate and resist the temptation to prosper through fraud upon financial institutions.

Whether this sentence exceeds a just punishment may also take into account the collateral consequences of the trial and conviction, such as the public humiliation and loss of real estate licensure, as noted by defense counsel.  (Def. Sent. Mem.

_____

grams of methamphetamine, for example, who must receive a sentence of at least 120 months under 21 U.S.C. § § 841 (b)(1)(A)(iii) or (viii), absent cooperation or "safety valve" characteristics.

at 19.)  The Court disagreed with the defense's further point
that the loss of his business, his personal and business
bankruptcies, and the loss of reputation as a successful
developer constitute being "sentenced" to the loss of everything
he worked for his entire life, and that such "punishment" should
suffice.  (Id.)  Those losses of the real estate business and the
business reputation, and the bankruptcies, occurred as a
consequence of defaults upon about $40,000,000 in loans, long
before this criminal prosecution and conviction, and they are not
punishments so much as they are the natural consequence of
defaulting on these loans, which can certainly happen in the
absence of criminality if the loans are not procured or avoided
by fraud.  The basis for punishment here is the nature of these
repeated frauds -- the crimes themselves -- and not the mere
defaults.

Again, the purposes of sentencing ordained by Congress will
be well-served by a sentence comporting with the recommended
Guideline Range under all the circumstances of this case.

Within that range, a sentence at the lower end was
determined to be sufficient but not greater than necessary to
comply with the Congressionally-declared purposes of sentencing
in 18 U.S.C. § 3553(a), above.  Thus, a sentence including
incarceration for 108 months was selected, together with five
years of supervised release, payment of restitution in the amount

38

of $17,469,284, no fine (due to inability to pay a fine in
addition to restitution), and appropriate conditions of
supervised release.

**August 4, 2005**                    **s/ Jerome B. Simandle**
Dated                                 Jerome B. Simandle
                                      United States District Judge